MARGARET A. MOESER
Chief, Money Laundering, Narcotics and Forfeiture Section
Criminal Division, U.S. Department of Justice
EMILY COHEN
CAYLEE E. CAMPBELL
KATHERINE NIELSEN
Trial Attorneys
1400 New York Ave NW
Washington, D.C. 20005
Telephone: (202) 514-1263
Attorneys for Plaintiff
United States of America

**FILED**
Dec 04, 2025
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MOHAMED AZAB YOUSSEF, <br> aka Ray Youssef, aka Rayam Youssef, <br> aka Ray Savant <br><br> Defendant. | CASE NO. 2:25-cr-0279-DC <br><br> Count One: 18 U.S.C. § 371 – Conspiracy to Willfully Fail to Maintain an Effective Anti-Money Laundering Program <br><br> Count Two: 18 U.S.C. § 371 – Conspiracy to Operate an Unlicensed Money Transmitting Business <br><br> Count Three: 18 U.S.C. §§ 1960 and 2 – Operating an Unlicensed Money Transmitting Business <br><br> Count Four: 18 U.S.C. § 371 – Conspiracy to Violate the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises Act <br><br> Forfeiture Allegations |

## INDICTMENT

The Grand Jury charges:

MOHAMED AZAB YOUSSEF, also known as Ray Youssef, also known as Rayam Youssef, also known as Ray Savant, herein, as follows:

### OVERVIEW

At all relevant times:

1.  MOHAMED AZAB YOUSSEF, a dual citizen of the United States and Egypt, and Artur Schaback (hereafter "Schaback"), charged elsewhere, founded, owned, controlled and maintained Paxful, Inc., a Delaware corporation established on or about July 17, 2015. Through Paxful, Inc. they operated an online peer-to-peer virtual currency marketplace known as "Paxful," available at www.paxful.com. MOHAMED AZAB YOUSSEF was the President and Chief Executive Officer of Paxful, Inc., and Schaback was, at various times, the Chief Technology Officer, Chief Operating Officer, and Chief Product Officer.

2.  On or about June 5, 2019, MOHAMED AZAB YOUSSEF and Schaback established and registered in Delaware Paxful Holdings, Inc. MOHAMED AZAB YOUSSEF and Schaback served as the sole board members of Paxful Holdings, Inc., held nearly all Paxful Holdings, Inc.'s common stock, and assumed leadership roles with decision-making authority within Paxful Holdings, Inc. Through Paxful Holdings, Inc., MOHAMED AZAB YOUSSEF and Schaback absorbed, established, registered, and controlled subsidiary companies, including but not limited to Paxful, Inc., that they used collectively to operate and support the Paxful marketplace.[1] (Unless otherwise specified, Paxful, Inc., Paxful Holdings, Inc., and subsidiaries hereinafter collectively "Paxful.")

### *The Paxful Virtual Currency Marketplace*

3.  Paxful offered customers in the United States and elsewhere a variety of services related to virtual currency, including money transmitting services. Primarily, the Paxful website served as an online trading market where customers with Paxful accounts negotiated for and traded in virtual currency, such as bitcoin, in exchange for other financial instruments, including gift cards, pre-paid cards, and fiat currency.

4.  To facilitate trades on behalf of customers, Paxful maintained virtual currency wallets known as "escrow wallets," custodial accounts controlled by Paxful, which were used to accept and hold customers' virtual currency until a trade was confirmed.[2] Once confirmed by the necessary customers,

---

[1] Paxful Holdings, Inc. also held a majority of the voting stock for a Philippines-based corporation incorporated by MOHAMED AZAB YOUSSEF and Schaback in or around 2019 and an Estonian entity established in or around 2016.

[2] Paxful hosted its own wallets from around August 2015 to around March 2016. In or around March 2016, Paxful contracted with a digital asset trust company to serve as the custodian of the escrow

Paxful directed and caused the release of virtual currency from the escrow wallets to the appropriate customer's Paxful account.

5. In addition to the virtual marketplace, Paxful offered customers the ability to store virtual currency in their Paxful accounts, transfer virtual currency to and from other Paxful accounts, and transfer virtual currency from Paxful accounts to external accounts, including those belonging to third-party vendors.

6. Paxful collaborated with third-party vendors, including by integrating "Pay With Paxful" ("PWP") widgets (buttons, that enable certain functions when clicked) on third-party websites to direct customers to the Paxful website for payment services. Upon instruction from customers seeking to send virtual currency to an external account, Paxful directed and caused the release of virtual currency from the escrow wallets to the designated external accounts.

7. Paxful collected fees related to its escrow and transfer services, including percentage fees for trades facilitated over the online marketplace, fees for certain internal transfers between Paxful customer accounts, and fees for external send-outs, such as those destined for third parties. The amount of each fee depended on the type of trade and payment method, the number of internal transfers conducted, and the dollar value of the external send-out.

8. Through Paxful, MOHAMED AZAB YOUSSEF and his co-conspirators, including Schaback, engaged in, facilitated, and profited from the national and international transfer of user funds, including throughout the United States and within the State and Eastern District of California.

*Legal Background*

9. By operating wholly or in substantial part within the United States, Paxful, was a financial institution within the meaning of 31 U.S.C. § 5312 and was required to comply with the requirements of the Bank Secrecy Act ("BSA"), codified at 31 U.S.C. § 5311 et seq., and its implementing regulations. Specifically, Paxful, constituted a money transmitting business ("MTB") under 31 U.S.C. § 5312(a)(2)(R) as a "sender of money or any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency, including any person who engages as a business in an informal

---

wallets but kept control over the release of virtual currency from the wallets by controlling the requisite private key.

money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside the conventional financial institutions system." Because Paxful was an MTB, or a "person who owns or controls a money transmitting business," it also constituted a money services business ("MSB") under the BSA. See 31 U.S.C. § 5330(d)(1)(A).

10. The BSA was designed to prevent, detect, and combat international money laundering and the financing of terrorism. 31 U.S.C. § 5311. The BSA imposed reporting, recordkeeping, and controls requirements on covered "financial institutions," which included MTBs, that were required to register with the Secretary of the Treasury. See 31 U.S.C. § 5330.

11. Under the BSA, within 90 days of the date the business was established, an MTB was required to establish an effective anti-money laundering ("AML") program that included, at a minimum: the development of internal policies, procedures, and controls; the designation of a compliance officer; an ongoing employee training program; and an independent audit function to test programs. See 31 U.S.C. § 5318(h)(1); 31 C.F.R. § 1022.210. MTBs also were required to file suspicious activity reports ("SARs"), including for transactions involving or aggregating at least $2,000 if the MTB knew, suspected, or had reason to suspect, among other things, that the transaction involved funds derived from illegal activity or that the MTB was being used to facilitate criminal activity. See 31 U.S.C. § 5318(g); 31 C.F.R. § 1022.320.

12. As a part of its AML program, an MTB was required to implement a written know your customer ("KYC") program that included risk-based procedures for verifying the identity of each customer to the extent reasonable and practicable. At a minimum, the KYC program was required to collect the name, date of birth, address, and other identifying information of each customer prior to account opening and take steps to verify that information in a reasonable time. The KYC program also was required to include procedures for determining whether a customer appeared on any list of known or suspected terrorists or terrorist organizations issued by any federal government agency. See 31 U.S.C. § 5318(l); 31 C.F.R. § 1022.210.

13. The Travel Act, codified at 18 U.S.C. § 1952, prohibited, among other things, the use of any facility in interstate or foreign commerce with intent to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

including any business enterprise involving prostitution offenses in violation of the laws of the State in which committed or of the United States.

14. The State of California criminalized the following prostitution offenses: California Penal Code §§ 647(b)(1)–(2) (soliciting or agreeing to engage in prostitution), 266h(a) (knowingly living or deriving support from earnings or proceeds of prostitution), and 266i(a)(1)–(a)(2) (procuring for, or, by any device or scheme, inducing, persuading, or encouraging a person to commit an act of prostitution).

15. The following constituted facilities in interstate and foreign commerce for purposes of the Travel Act: (1) the Internet, including but not limited to websites such as www.paxful.com, www.backpage.com, and Internet Website 1; (2) Internet enabled communications software; (3) Internet service providers; and (4) phones.

### *Initial Allegations*

16. From at least in or around 2015 through in or around April 2018, www.backpage.com ("Backpage") hosted a variety of advertising categories, including an "adult" section, where users could pay to post advertisements for "adult jobs," "therapeutic massages," "escorts," and "body rubs." The website, and particularly its adult advertising pages, were commonly used to promote commercial sex throughout the United States. In various criminal proceedings, Backpage and its owners and operators admitted that Backpage advertised and profited from illegal prostitution, including illegal sex work depicting minors.

17. In or around July 2015, major credit card companies stopped processing transactions for adult services advertisements on backpage.com. The website subsequently accepted virtual currency as a payment method.

18. Also in or around 2015, Paxful developed a business model focused on providing a virtual currency payment method to facilitate and promote businesses involving prostitution, including Backpage. In one email to a reporter, dated October 5, 2015, MOHAMED AZAB YOUSSEF stated, "Our little bitcoin startup got flooded with calls from escorts around the world desperate for bitcoin. I personally did support with them for 3 months and the ride was wild. Screaming sducidal [sic] women, babies screaming in the background and calls from angry pimps." Also in or around October 2015, MOHAMED AZAB YOUSSEF boasted in a social media post about the "Backpage Effect," stating "[w]e all thought bitcoin

traffic would go down but instead…it is growing faster than ever. Ever[y] minute there are at least 20 transactions from the Paxful wallet to Backpage." On or about May 24, 2016, in a Paxful blog article, MOHAMED AZAB YOUSSEF explained his personal interactions with a prostitute, his desire to focus on the "40% of Americans [who] are unbanked and sex workers," and boasted that "a[n] invisible and shunned community, sex workers were being helped by another invisible and shunned community, bitcoin people."

19. Paxful eventually integrated a PWP widget onto Backpage, enabling customers to easily purchase credits to pay for commercial sex ads using bitcoin sent to Backpage from their Paxful accounts. Further, Paxful sought to identify similar websites to work with.

20. On or about April 6, 2018, federal authorities seized and shut down Backpage and its affiliated websites as part of a criminal investigation. Paxful continued to focus its business model on other, similar platforms, including Internet Website 1.

21. From at least in or around April 2018, and continuing to at least December 2022, Internet Website 1 allowed users to pay to post advertisements for adult services and was used to facilitate and promote commercial sex, including in the United States. Internet Website 1 was described online as a site similar to Backpage or an alternative to Backpage. Like Backpage, Internet Website 1 accepted virtual currency as payment for advertisements.

22. In or around 2018, Paxful also began transmitting bitcoin transfers to Internet Website 1. On or about May 31, 2018, six Paxful employees, including Schaback and MOHAMED AZAB YOUSSEF, discussed Internet Website 1. One stated "So Backpage is back as '[Internet Website 1]' . . . who knew girls talk . . . full PWP support too . . . on bright side girls who learnt that system will be coming back through Paxful again." MOHAMED AZAB YOUSSEF responded, "Lol [laughing emoticon]."

23. Following its success with Backpage, MOHAMED AZAB YOUSSEF drafted a "Roadmap" for Paxful's PWP. In an email dated April 6, 2018, MOHAMED AZAB YOUSSEF identified a goal of creating "an easy to use payment system for the unbanked to purchase online" that sought to solve certain identified "problems," including how to serve "vice industries," including: gambling sites

"forbidden to do business with Americans"; "pornography and adult sites"; and marijuana merchants, noting that the drug was not "federally legal in the USA."

24. The conspirators knew that Paxful marketplace also facilitated fraud and money laundering, but they saw these markets as another lucrative business opportunity.

25. On or about July 10, 2017, in a Slack chat with other Paxful employees, MOHAMED AZAB YOUSSEF wrote, "It really feels like Nigeria will be our next Backpage. . . . No one else wants to touch them but it is a goldmine.. the biggest economy in all Africa. We are moving from a website to an entire nation and continent... Thank GOD!"

26. On or about July 2, 2018, employees of Paxful discussed Paxful's African market as "scammers" and "a shit show." One employee stated, "otc vendors are going to a legit exchange unless they want to unload laundered currency." The same employee added, "[I] talked to [MOHAMED AZAB YOUSSEF], and he is putting in his ear buds.. doesnt [sic] want to hear the shit.. lol." The employees continued to discuss the African "scammers," with one concluding, "...we stepped into this and unfortunately can't do a step back. .... Now we just can't close this way as it's a greater part of our business. .... In short term was good business strategy, in in the long run it can kill us."

## COUNT ONE
### Conspiracy to Willfully Cause a Financial Institution to Fail to Maintain an Effective Anti-Money Laundering Program
### 18 U.S.C. § 371

27. Paragraphs 1 through 26 of this Indictment are realleged and incorporated herein.

28. From in or around July 2015, through in or around at least November 2019, in the Eastern District of California and elsewhere, MOHAMED AZAB YOUSSEF knowingly and willfully combined, conspired, confederated, and agreed with others known and unknown to the United States to commit an offense against the United States, that is: to willfully cause Paxful to fail to establish, develop, implement, and maintain an effective anti-money laundering program, commensurate with the risks posed by the location and size of, and the nature and volume of the financial services provided by the money transmitting business, that is, Paxful that were reasonably designed to prevent the money transmitting business from being used to facilitate money laundering and the financing of terrorist activities, and including, at a minimum—(A) the development of internal policies, procedures, and controls; (B) the

designation of a compliance officer; (C) an ongoing employee training program; and (D) an independent audit function to test programs, in violation of the Bank Secrecy Act, specifically, 31 U.S.C. §§ 5318(h)(1)-(2) and 5322 and regulations issued thereunder, specifically 31 C.F.R. §§ 1022.210 & 1022.320.

## MANNER AND MEANS

The manner and means by which MOHAMED AZAB YOUSSEF, Schaback, and others sought to accomplish the objects of the conspiracy included, among others, the following:

29. MOHAMED AZAB YOUSSEF and Schaback established and controlled multiple entities to operate the Paxful platform.

30. MOHAMED AZAB YOUSSEF and Schaback controlled Paxful, including www.paxful.com, and made executive decisions regarding Paxful's operations.

31. MOHAMED AZAB YOUSSEF and Schaback designed, intended, and operated Paxful to accept funds from customers around the world, including in the United States, and to facilitate the transfer of such funds between, among, and on behalf of Paxful customers.

32. MOHAMED AZAB YOUSSEF and Schaback contracted with a digital asset trust company located in the United States to assist in the transfer of virtual currency on behalf of Paxful customers by using the digital asset trust company as a third-party custodian of Paxful's virtual currency escrow wallets, which accepted, stored, and transferred Paxful customer virtual currency.

33. MOHAMED AZAB YOUSSEF and Schaback maintained control of the requisite private key—a key required to access and manage virtual currency within a wallet—to the escrow wallets and, accordingly, maintained control over the transfer of virtual currency from those same wallets.

34. MOHAMED AZAB YOUSSEF and co-conspirators willfully failed to implement and maintain policies, procedures, and internal controls reasonably designed to assure compliance with the BSA for: (1) an effective AML program; (2) verifying customer identification; (3) filing SARs; (4) designating a person to assure day-to-day compliance with the AML program, including by properly filing reports, creating and retaining records, updating the program as necessary, and providing appropriate training and education; (5) providing for independent audit functions to test the AML program; (6) and providing training for appropriate personnel. For example, MOHAMED AZAB YOUSSEF, Schaback,

and co-conspirators known and unknown:

    a. Allowed customers to open Paxful accounts and trade on www.paxful.com without providing sufficient identifying information or documents to allow Paxful to verify the true identities of its customers;

    b. Marketed Paxful to customers as a platform that did not require KYC and/or that allowed "buying without ID;"

    c. Facilitated the transfer of funds between customers without conducting KYC, despite knowing Paxful was required to do so;

    d. Misled financial institutions and companies about Paxful's AML program, knowing that Paxful's AML program was ineffective and that this information was material to the other financial institutions and companies;

    e. Failed to establish AML and KYC policies and procedures to monitor customer transactions for money laundering, sanctions violations, illegal prostitution, and terrorist funding, among other criminal activity;

    f. Presented an AML policy that was copied from another institution to third parties, knowing that the stated programs were not implemented at Paxful, which did not have an AML program at the time Paxful presented the policy;

    g. Made exceptions to AML and KYC policies as requested by MOHAMED AZAB YOUSSEF and Schaback;

    h. Failed, until in or around November 2018, to designate a compliance officer to ensure day-to-day compliance with AML and KYC programs;

    i. Failed, until in or around June 2019, to provide training to employees related to AML and KYC;

    j. Failed, until in or around November 2019, to file a single SAR, despite knowing that Paxful customers conducted suspicious and criminal activity, including money laundering, and despite receiving law enforcement and public requests related to such activity; and

    k. Failed, until in or around September 2020, to provide for independent compliance testing or auditing for AML.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purposes, at least one of the conspirators committed, and caused to be committed, in the Eastern District of California and elsewhere, the following overt acts, among others:

35. On or about August 15, 2016, MOHAMED AZAB YOUSSEF, representing that it was Paxful's AML policy, sent an AML policy that had been adapted from the AML policy of a university and which, in fact, MOHAMED AZAB YOUSSEF and co-conspirators known and unknown did not implement or enforce at Paxful, to a separate virtual currency exchange where they sought to open an account.

36. On or about January 9, 2017, MOHAMED AZAB YOUSSEF completed an application for Paxful to open an account at another virtual currency exchange, in which he falsely claimed, among other things, that Paxful assessed its customers' AML policies and procedures, collected KYC information, conducted transaction monitoring, and provided its employees with AML training.

37. On or about February 17, 2017, MOHAMED AZAB YOUSSEF, and co-conspirators known and unknown, sent or caused to be sent an updated AML policy, which they did not, in fact, implement or enforce at Paxful, to a separate virtual currency exchange that had criticized a prior version they had submitted.

38. On or about April 14, 2017, Schaback sent an email to a prospective Paxful customer sharing the benefits of Paxful in which he stated that trades were "instant and anonymous whereas with exchanges you have to KYC yourself and wait 5 days for bitcoins to arrive" and noted that gift cards, cash deposits, and Western Union deposits had markups up to 20 percent but were "instant and anonymous."

39. On or about December 17, 2017, Schaback sent an internal communication to MOHAMED AZAB YOUSSEF stating that Paxful, should not conduct KYC on "small amount buyers."

40. On or about the dates listed below, MOHAMED AZAB YOUSSEF, and co-conspirators known and unknown, allowed undercover law enforcement located within the Eastern District of California to open Paxful accounts and conduct trades on Paxful without requiring or receiving any identification or other KYC information beyond a name and email address:

| Account Opening/Transaction Date | Account Name |
|---|---|
| Opening: October 14, 2016 | snowbunnyman |
| Transaction: October 26, 2016 | snowbunnyman |
| Transaction: November 30, 2016 | snowbunnyman |
| Opening: April 1, 2019 | Dr.Frosty |
| Opening: April 8, 2019 | Therealpureheroin |
| Transaction: September 23, 2019 | Therealpureheroin |

41. On or about October 18, 2019, MOHAMED AZAB YOUSSEF, and co-conspirators known and unknown, allowed undercover law enforcement located within the Eastern District of California to use the Paxful account "Therealpureheroin," which Paxful permitted to be opened without KYC, to complete a bitcoin sale despite explicitly referencing selling heroin on the dark net market with the buyer.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
Conspiracy to Operate an Unlicensed Money Transmitting Business
18 U.S.C. § 371

42. Paragraphs 1 through 26 of this Indictment are realleged and incorporated herein.

43. From in or around July 2015 through in or around at least December 2022, in the Eastern District of California and elsewhere, MOHAMED AZAB YOUSSEF knowingly and willfully combined, conspired, confederated, and agreed with others known and unknown to the United States to commit an offense against the United States, that is: to knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business, that is, a money transmitting business which affects interstate and foreign commerce in any manner and degree and which otherwise involves the transportation and transmission of funds that are known to have been derived from a criminal offense and are intended to be used to promote and support unlawful activity, in violation of 18 U.S.C. §§ 1960(a) and (b)(1)(C).

## MANNER AND MEANS

The manner and means by which MOHAMED AZAB YOUSSEF, Schaback, and others sought to accomplish the object of the conspiracy included, among others, the following:

44. Paragraphs 29 through 34 of this Indictment are realleged and incorporated herein.

45. Members of the conspiracy sought to do business with websites they knew were engaged in advertising illegal prostitution and commercial sex services in the United States, including Backpage and Internet Website 1, among other similar sites.

46. Members of the conspiracy communicated with customers of Backpage to assist them in opening Paxful accounts from which they could send bitcoin to Backpage for commercial sex advertisements.

47. Members of the conspiracy communicated about and knowingly facilitated transfers of funds on behalf of customers seeking to send virtual currency to Backpage, Internet Website 1, and similar sites, to pay for commercial sex advertisements.

48. Members of the conspiracy communicated about and knowingly facilitated transfers of funds derived and suspected to be derived from other unlawful activity, including illegal prostitution and fraud schemes and scams.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its object and purposes, at least one of the conspirators committed, or caused to be committed, in the Eastern District of California and elsewhere, the following overt acts, among others:

49. On or about July 17, 2015, MOHAMED AZAB YOUSSEF and Schaback established and registered in the State of Delaware the corporation "Paxful, Inc.," which they used to operate Paxful.

50. In or around March 2016, Paxful, MOHAMED AZAB YOUSSEF, and Schaback entered an agreement with Digital Asset Trust Company 1 for custodial services related to maintaining Paxful's escrow wallets.

51. On or about June 5, 2019, MOHAMED AZAB YOUSSEF and Schaback established and registered in the State of Delaware the corporation "PAXFUL HOLDINGS, INC.," which they used to control Paxful, Inc., and to operate Paxful.

52. On or about July 22, 2015, MOHAMED AZAB YOUSSEF sent an email to Backpage employees listing recommendations to increase conversion rates, that is, the number of customers that switch to using virtual currency, and providing a link, http://blog.paxful.com/how-to-buy-bitcoin-for-backpage/, to a guide Paxful prepared for Backpage customers.

53. In or around August 2015, MOHAMED AZAB YOUSSEF, Schaback, and others integrated a PWP widget onto Backpage.

54. On or about the dates listed below, employees of Paxful engaged in conversations with individuals they believed to be Paxful customers, but who, in fact, were undercover law enforcement agents located within the Eastern District of California, about using Paxful in connection with Backpage, Internet Website 1, and commercial sex advertisements:

| Date | Conversation |
| --- | --- |
| October 14, 2016 | An employee of Paxful provided advice to an undercover law enforcement agent on how to use bitcoin to post an advertisement on Backpage. |
| November 22, 2016 | An employee of Paxful provided advice to an undercover law enforcement agent about how to contact Backpage to discuss advertisements. In or around one week later, the undercover agent created a fake prostitution advertisement and posted it on Backpage using the PWP widget and bitcoin from a Paxful account. |
| June 8, 2018 | An employee of Paxful discussed how to dispute a trade with an undercover law enforcement agent who disclosed that the trade was related to paying for advertisements on Internet Website 1. |

55. On or about the dates listed below, Paxful directed and caused the transfer of virtual currency from Paxful to a wallet address associated with Internet Website 1:

| Date | Virtual Currency Transferred |
| --- | --- |
| December 18, 2022 | 0.0034 bitcoin |
| December 20, 2022 | 0.0072 bitcoin |
| December 29, 2022 | 0.003917 bitcoin |

All in violation of Title 18, United States Code, Section 371.

COUNT THREE
Operating an Unlicensed Money Transmitting Business
18 U.S.C. §§ 1960(a) & (b)(1)(C) and 2

56. Paragraphs 1 through 26 of this Indictment are realleged and incorporated herein.

57. From in or around July 2015, through in or around at least December 2022, in the Eastern District of California and elsewhere, MOHAMED AZAB YOUSSEF did knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business, that is, a money transmitting business which affected interstate and foreign commerce in any manner and degree and which otherwise involves the transportation and transmission of funds that are known to have been derived from a criminal offense and are intended to be used to promote and support unlawful activity.

In violation of Title 18, United States Code, Sections 1960(a) & (b)(1)(C) and 2.

### COUNT FOUR
Conspiracy to Violate the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises Act
18 U.S.C. § 371

58. Paragraphs 1 through 26 of this Indictment are realleged and incorporated herein.

59. From in or around July 2015, through in or around at least December 2022, within the Eastern District of California, and elsewhere, MOHAMED AZAB YOUSSEF knowingly and willfully combined, conspired, confederated, and agreed with others known and unknown to the United States to commit an offense against the United States, that is: to use and cause to be used a facility in interstate and foreign commerce, namely the Internet, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, a business enterprise involving prostitution, in violation of the laws of the State of California, and thereafter perform and attempt to perform an act to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of such unlawful activity, in violation of 18 U.S.C. § 1952(a)(3).

### MANNER AND MEANS

The manner and means by which MOHAMED AZAB YOUSSEF, Schaback, and others sought to accomplish the object of the conspiracy included, among others, the following:

60. Paragraphs 45 through 48 of this Indictment are realleged and incorporated herein.

61. Members of the conspiracy communicated with Backpage employees, including over email, about ways to improve their business collaboration.

62. Members of the conspiracy created and disseminated guides for customers associated with Backpage, instructing them on how to use Paxful to purchase bitcoin to send to Backpage.

63. Members of the conspiracy created a "landing page" on Paxful's website for customers seeking payment services for commercial sex advertisements on Backpage.

64. Members of the conspiracy integrated the PWP widget onto Backpage to streamline the users' connection to www.paxful.com.

65. Members of the conspiracy allowed customers seeking to send virtual currency to Backpage and Internet Website 1 to open accounts and transmit bitcoin to the sites for commercial sex advertisements.

66. Members of the conspiracy used the Internet to accept, store, and transfer virtual currency on behalf of Paxful users to wallets controlled by the websites engaged in advertising prostitution, including Backpage and Internet Website 1.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its object and purposes, at least one of the conspirators committed, or caused to be committed, in the Eastern District of California and elsewhere, the following overt acts, among others:

67. Paragraphs 52 through 55 of this Indictment are realleged and incorporated herein.

68. In or around April 2018, a member of the conspiracy conducted website analysis on Internet Website 1 to determine the level of traffic and engagement Internet Website 1 was sending to Paxful.

69. On or about October 7, 2018, Schaback and other Paxful employees created an internal document documenting a discussion about setting up technological integration and communicating with a website similar to Backpage and Internet Website 1, that, in fact, had Backpage in its name.

70. On or about January 2, 2019, a Paxful employee informed another employee that he had "[done] his dirty" and contacted a website similar to Backpage requesting to add Paxful to their "how to buy bitcoin page."

71. From on or about July 26, 2018 until on or about October 9, 2023, Paxful transferred approximately $2,995,553 worth of virtual currency to Internet Website 1.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATIONS

48. The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for purpose of providing notice of forfeiture.

49. Upon conviction of the offense in violation of 18 U.S.C. § 371, alleged in Count Two (Conspiracy to Operate an Unlicensed Money Transmitting Business) and Count Four (Conspiracy to Violate the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises Act), MOHAMED AZAB YOUSSEF shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes and is derived from proceeds traceable to such offense. The United States may seek a forfeiture money judgment against MOHAMED AZAB YOUSSEF in the amount of any property, real or personal, that constitutes or is derived, directly or indirectly, from proceeds traceable to the commission of Count Two and Count Four, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

50. Upon conviction of the offense in violation of 18 U.S.C. §§ 1960(a) and (b)(1)(C), alleged in Count Three (Operating an Unlicensed Money Transmitting Business), MOHAMED AZAB YOUSSEF shall forfeit to the United States, pursuant to 18 U.S.C. §§ 982(a)(1), and 981(a)(1)(A) and (C), and 28 U.S.C. § 2461(c), any property, real or personal, involved in such offense. The United States may seek a forfeiture money judgment against MOHAMED AZAB YOUSSEF in the amount of any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1960(a) and (b)(1)(C), as alleged in Count Three, pursuant to 18 U.S.C. §§ 982(a)(1), and 981(a)(1)(A) and (C), and 28 U.S.C. § 2461(c).

51. If any of the property described above as being subject to forfeiture, as a result of any act or omission of MOHAMED AZAB YOUSSEF,

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be subdivided without difficulty,

INDICTMENT 16

1  MOHAMED AZAB YOUSSEF shall forfeit to the United States any other property, up to the value of
2  the property described above, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

MARGARET A. MOESER
Chief, Money Laundering, Narcotics and
Forfeiture Section, Criminal Division
U.S. Department of Justice

A TRUE BILL
/s/ Signature on file w/AUSA

FOREPERSON

By: _____
EMILY COHEN
CAYLEE E. CAMPBELL
KATHERINE NIELSEN
Trial Attorneys

No. 2:25-cr-0279-DC

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

### THE UNITED STATES OF AMERICA
vs.

### MOHAMED AZAB YOUSSEF,
aka Ray Youssef, aka Rayam Youssef, aka Ray Savant

### I N D I C T M E N T

**VIOLATION(S):**
18 U.S.C. § 371 — Conspiracy to Willfully Fail to Maintain an Effective Anti-Money Laundering Program;
18 U.S.C. § 371 — Conspiracy to Operate an Unlicensed Money Transmitting Business;
18 U.S.C. §§ 1960 and 2 — Operating an Unlicensed Money Transmitting Business;
18 U.S.C. § 371 — Conspiracy to Violate the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises Act

*A true bill,*   /s/ Signature on file w/AUSA

*Foreman.*

*Filed in open court this* 4th *day of* December *, A.D. 20* 25

/s/ J. Murphy
*Clerk.*

Bail, $ **No Bail Warrant Pending Hearing**

CHI SOO KIM
UNITED STATES MAGISTRATE JUDGE

GPO 863 525

2:25-cr-0279-DC

# United States v. Youssef
## Penalties for Indictment

**Defendant**
MOHAMMED AZAB YOUSSEF
aka Ray Youssef, aka, Rayam Youssef, aka Ray Savant

**COUNT 1:**

VIOLATION:    18 U.S.C. § 371 – Conspiracy to Willfully Fail to Maintain an Effective Anti-Money Laundering Program

PENALTIES:    Up to 5 years of imprisonment, or fine up to $250,000 or twice the pecuniary gain or loss, or both imprisonment and a fine;
Up to 3 years of supervised release

SPECIAL ASSESSMENT: $100

**COUNT 2:**    MOHAMMED AZAB YOUSSEF

VIOLATION:    18 U.S.C. § 371 – Conspiracy to Operate an Unlicensed Money Transmitting Business

PENALTIES:    Up to 5 years of imprisonment, or fine up to $250,000 or twice the pecuniary gain or loss, or both imprisonment and a fine;
Up to 3 years of supervised release

SPECIAL ASSESSMENT: $100

**COUNT 3:**    MOHAMMED AZAB YOUSSEF

VIOLATION:    18 U.S.C. §§ 1960(b)(1)(C) & 2 – Operating an Unlicensed Money Transmitting Business

PENALTIES:    Up to 5 years of imprisonment, or fine up to $250,000 or twice the pecuniary gain or loss, or both imprisonment and a fine;
Up to 3 years of supervised release

**COUNT 4:**    MOHAMMED AZAB YOUSSEF

VIOLATION:    18 U.S.C. § 371 – Conspiracy to Violate the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises Act

PENALTIES:    Up to 5 years of imprisonment, or fine up to $250,000 or twice the pecuniary gain or loss, or both imprisonment and a fine;
Up to 3 years of supervised release

**FORFEITURE ALLEGATION:**

VIOLATION:  18 U.S.C. §§ 981(a)(1)(C), 982(a)(1)(A) and (C), and 28 U.S.C. § 2461(c) – Criminal Forfeiture

PENALTIES:  As stated in the charging document